NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ACE EUROPEAN GROUP and CERTAIN UNDERWRITERS AT LLOYDS OF LONDON SUBSCRIBING TO POLICY NUMBER AIH-17555,<br><br>Plaintiffs,<br><br>v.<br><br>KATRINA SAPPE and JOHN DOES 1-10,<br><br>Defendants<br><br>v.<br><br>JEROME DAVENPORT and COE INSURANCE AGENCY, INC.,<br><br>Third Party Defendants | Civil Action No.: 08-412 (JLL)<br><br>OPINION |

**LINARES**, District Judge.

This matter comes before the Court by way of two motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. The first is by Plaintiffs Ace European Group and Certain Underwriters at Lloyds of London ("Plaintiffs" or "Ace") and the second is by Third Party Defendants Jerome Davenport and The Coe Insurance Agency, Inc. ("Third Party Defendants"). The Court has considered the parties' written submissions. No oral argument was heard pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court finds that rescission of the relevant policy is warranted and grants summary judgment in favor of

1

Plaintiff. In addition, the Court grants summary judgment in favor of Third Party Defendants as to Counts I and V of Defendant's Third Party Complaint only.

## I. BACKGROUND

Plaintiffs are foreign insurers based in London, England, who provide surplus lines insurance to insureds located in New Jersey and elsewhere. (Pls.' Mot. for Summ. J., 4). On June 26, 2006, Defendant Katrina Sappe ("Defendant" or "Sappe") applied for a homeowner's insurance policy ("Application") for her residence in Jersey City, New Jersey ("Policy") with the assistance of an insurance broker, Third Party Defendants Jerome Davenport and The Coe Insurance Agency, Inc. (Pls.' Mot. for Summ. J., 4; Pls.' Undisputed Facts, ¶¶ 7-8). The Application was faxed to the underwriter, Jimcor Agencies the same day. (Pls.' Mot. for Summ. J., 5). Strangely, at about the same time the Application was faxed to the underwriter, a fire occurred on the premises owned by Defendant and it was destroyed. (Pls.' Mot. for Summ. J., 4-5; Pls.' Undisputed Facts, ¶ 6)). The following day, June 27, 2006, the underwriter at Jimcor issued a binder of insurance, which was eventually issued as policy AIH-17555. (Pls.' Mot. for Summ. J., 5).

<u>The Application</u>

Defendant obtained the Application with the assistance of Third Party Defendant Jerome Davenport, the commercial sales manager for The Coe Insurance Agency, Inc. (Pls.' Mot. for Summ. J., 4; Pls.' Undisputed Facts, ¶ 8). Defendant previously obtained an insurance policy with a different carrier in approximately 2000, and dealt with Mr. Davenport at that time as well.

(Pls.' Mot. for Summ. J., 4; Pls.' Undisputed Facts, ¶ 12).

The Application contained a series of questions, which if answered "yes" required further explanation. (Pls.' Mot. for Summ. J., 4; Exs. 3-4). One such question asked whether there was "any farming or other business conducted on premises (including day/child care)," which was answered "no." (Pls.' Mot. for Summ. J., 5). However, Defendant "testified under oath that she operated a daycare business [at her residence, which was] licensed by the New Jersey Department of Human Services, Division of Youth and Family Services that was operated in affiliation with the Jersey City Urban League." (Pls.' Mot. for Summ. J., 7). Further, Defendant allegedly "estimated that she received approximately $22,000.00 per year before the fire" and that the business began in approximately 2000. (Pls.' Mot. for Summ. J., 7).

In addition, Defendant did not disclose what Plaintiff describes as "a lucrative seamstress/designer business being conducted in the home." (Pls.' Mot. for Summ. J., 6). However, Defendant characterizes these two activities differently and states that the babysitting was not a business in the sense contemplated by the insurance industry. (Def.'s Mot. for Summ. J., 7). In any event, Plaintiffs maintain that they were unaware of these activities at the time of the Application. (Pls.' Mot. for Summ. J., 7).

Defendant signed the Application, which contained a representation: "I have read the above application and any attachments. I declare that the information provided in them is true, complete and correct to the best of my knowledge and belief. This information is being offered to the company as an inducement to issue the policy for which I am applying." (Pls.' Mot. for Summ. J., Ex. 3-4). Plaintiffs posit that Defendant knowingly gave false information that would have disqualified her from obtaining a homeowner's policy. (Pls.' Mot. for Summ. J., 8). In

3

addition, Plaintiffs assert that a binder would not have been issued without Defendant either purchasing a commercial policy for the premises or providing proof of a commercial policy in existence, nor would a binder have been issued if Defendant disclosed the seamstress/designer business without further information. (Pls.' Mot. for Summ. J., 8).

During the application process for Defendant's prior policy obtained in 2000 and issued through a different carrier, Third Party Defendant Jerome Davenport of The Coe Agency allegedly informed Defendant that a childcare business may require commercial coverage and inspection of the premises. (Pls.' Mot. for Summ. J., 7). Defendant states that "she recalls advising the Third-Party Defendant agent, Jerome Davenport, at the time of application, not only for the policy in question, but for her prior policies obtained through Third-Party Defendants, that she had a childcare arrangement with the Urban League, and has never tried to conceal it." (Def.'s Mot. for Summ. J., 6). Significantly, Defendant submits that she has "no recollection of being interviewed or otherwise questioned in order to assist completing the application in 2006." (Def.'s Mot. for Summ. J., 6). Rather, as she recalls, Third Party Defendant Jerome Davenport completed the forms. (Def.'s Mot. for Summ. J., 6). Further, "[w]hen she declined to pursue commercial coverage [because she could not afford the premium], Coe and Davenport simply wrote the homeowner's policy anyway." (Def.'s Mot. for Summ. J., 7; Statement of Facts, ¶ 9).

The Post-Loss Investigation

Defendant entered into a contract with North Jersey Public Adjuster to assist her with her claim through a third party administrator, Raphael and Associates. (Pls.' Mot. for Summ. J., 5).

Under the terms of the Policy, Defendant was required to cooperate with a post-loss investigation. The Policy provides, in relevant part, as follows:

> Your Duties After Loss. In the case of a loss to covered property, you must see that the following are done: . . . e. Prepare an inventory of damage to personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts, and related documents that justify the figures in the inventory. f. As often as we reasonably require . . . (2) Provide us with records and documents we request and permit us to make copies; and (3) Submit to examination under oath, while not in the presence of any other "insured", and sign same . . . .

(Pls.' Mot. for Summ. J., Exs. 3-4). On or about October 31, 2006, Defendant appeared for an initial examination under oath following the fire, but she requested that the examination be adjourned so that she could retain an attorney. (Pls.' Mot. for Summ. J., 5; Def. Mot. for Summ. J., Statement of Facts ¶ 25). On or about November 30, 2006, Defendant appeared for a second time despite the fact that she had not yet retained an attorney, but the testimony was not completed. (Pls.' Mot. for Summ. J., 5; Def. Mot. for Summ. J., Statement of Facts ¶ 24). Subsequently, Plaintiffs notified Ms. Sappe as well as her counsel of the examinations under oath as well as the documents sought. (Pls.' Mot. for Summ. J., 6). Defendant never appeared to complete the examination nor provided the requested documents. (Pls.' Mot. for Summ. J., 6). In addition, Plaintiffs notified Defendant of their request for an examination under oath of Calvin and Aston Sappe, who were present at the time of the fire, but neither appeared. (Pls.' Mot. for Summ. J., 5-6). Plaintiffs also assert that Defendant Sappe gave contradicting testimony during the examinations.

As to documentary evidence, when Defendant appeared for the examination under oath she brought certain documents with her, but according to Plaintiffs, "she would not permit the documents to be copied as required by the insurance policy." (Pls.' Mot. for Summ. J., 5).

However, Defendant asserts that the facility chosen by Plaintiffs did not contain a photocopier and she did not want to relinquish the originals for fear of their being lost. (Def.'s Mot. for Summ. J., 5).

The public adjuster informed Defendant and her counsel that coverage was disclaimed for failure to cooperate in the post-loss investigation, as required by the Policy, because of the following: "Defendant's refusal to appear for the completion of her examination under oath; failure to produce Calvin Sappe and Aston Sappe for an examination under oath; failure to provide an inventory or the lost or damages [sic] contents of the premises; and failure to provide the documents and records." (Pls.' Mot. for Summ. J., 6).

Procedural History

Plaintiffs filed suit on January 22, 2008 against Defendant Sappe. (CM/ECF No. 1), seeking a declaratory judgment as to the following: (1) that Plaintiffs are under no duty to indemnify Sappe because she did not cooperate during the post-loss investigation, as required by the terms of the Policy; and (2) that the Policy is null and void because of Defendant's failure to disclose information in the Application. (Amended Complaint, CM/ECF No. 29). Defendant Sappe asserted a counterclaim against Plaintiffs seeking a declaratory judgment that "Plaintiffs are obligated to indemnify her for losses sustained in the fire and related losses," and a third-party complaint against Jerome Davenport and the Coe Agency. (CM/ECF No. 36 Amended Answer and Counterclaim). The third party complaint asserts the following causes of action against Davenport and Coe: (1) reformation; (2) breach of duty of good faith and fair dealing; (3) negligence; (4) breach of contract; and (5) violation of the New Jersey Consumer Fraud Act

("CFA").

Plaintiffs move for summary judgment, arguing that they are entitled to a declaratory judgment that they are under no duty to pay insurance proceeds to Defendant Sappe because of the following: 1) Defendant Sappe did not cooperate in the post-loss investigation; and 2) misrepresentations in the application for insurance render the policy null and void.

Third Party Defendants focus their motion on the argument that denial of coverage is warranted because Sappe failed to cooperate during the post-loss investigation, with which they were not involved. They additionally argue that if the Court denies Plaintiffs' motion for summary judgment as to the failure to cooperate claim, summary judgment should be granted as to the reformation (Count I) and Consumer Fraud Act (Count V) claims in the Third Party Complaint.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must first demonstrate that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court construes facts and inferences in the light most favorable to the non-movant in order to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). An issue is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable,

or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). "Thus, if a reasonable fact finder could find in the nonmovant's favor, then summary judgment may not be granted." Norfolk Southern Ry. Co. v. Basell USA Inc., 512 F.3d 86, 91 (3d Cir. 2008).

## III. DISCUSSION

Rescission is warranted if a misrepresentation or false statement in an application for insurance materially affects the acceptance of the risk or hazard by the insurer. Ledley v. William Penn Life Ins. Co., 138 N.J. 627, 637-638 (1995). There is no question that an "insured should 'disclose all facts relating to . . . general [matters] in the application when such information is requested. It is he and he alone who has the necessary complete knowledge of the facts . . . .'" Ledley, 138 N.J. at 640.

A false statement bars "the right of recovery" if it "materially affected *either* the acceptance of the risk *or* the hazard assumed by the insurer." Mass. Mutual Life Ins. Co. v. Manzo, 122 N.J. 104, 115 (1991) (emphasis in original) (quoting N.J.S.A. 17B:24-3(d)). "A misrepresentation is material if it 'naturally and reasonably influenced the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.'" Ledley, 138 N.J. at 638; Mass. Mutual, 122 N.J. at 115. The parties dispute the nature and extent of the babysitting/daycare operation. However, the Court finds that under either characterization answering "no" without providing further information was a material misstatement because operating a babysitting/daycare service, in particular, significantly affected the degree and character of the risk assumed by Ace.

Rescission does not require actual intent to deceive, rather "even an innocent misrepresentation can constitute equitable fraud justifying rescission." Id.; Mass. Mutual v. Manzo, 122 N.J. at 114. Equitable fraud analysis distinguishes between objective and subjective questions on an application for insurance. Ledley, 138 N.J. at 635; Mass. Mutual v. Manzo, 122 N.J. at 114 (the distinction alleviates the unfairness of permitting an insurer to rescind because of unintentional misrepresentations).

> Objective questions call for information within the applicant's knowledge, 'such as whether the applicant has been examined or treated by a physician. In contrast, subjective questions 'seek to prove the applicant's state of mind.' They are concerned with more ambiguous issues, such as 'what is the state of the applicant's health or whether the applicant has or has had a specified disease or illness.' Courts have been more lenient when reviewing an applicant's misrepresentation made in response to a subjective question than to an objective question. The rationale behind the distinction between objective and subjective questions is that the answer to a subjective question will not constitute equitable fraud if the question is directed toward probing the knowledge of the applicant and determining the state of his mind and . . . the answer is a correct statement of the applicant's knowledge and belief.

Ledley, 138 N.J. at 636 (citations omitted).

As noted above, the question provided as follows: whether there was "any farming or other business conducted on premises (including day/child care)." (Pls.' Mot. for Summ. J., 4; Exs. 3-4). Although objective on its face, in the context of the discussion of Mr. Davenport's deposition testimony, Defendant implicitly argues that the question about business operations could be construed as subjective because it does not clearly define the term "business." (Def.'s Mot. for Summ. J., 21). However, to the extent that Defendant does so, this argument carries little weight because the question specifically includes day/childcare. Therefore, the Court finds that not disclosing the day/childcare on the premises was a material omission in response to an objective question, which is sufficient to warrant rescission.

Finally, Defendant states that the copy of the Application produced by Plaintiffs is not an original and the typeface of the "critical question," presumably about whether the Insured ran any businesses out of her home, is different than the rest of the questions and appears to be superimposed. (Def. Mot. for Summ. J., Statement of Facts, ¶ 11). However, Defendant does not deny answering that question. In fact, Defendant dedicates much of her Opposition to arguing that she told Third Party Defendants about the daycare/childcare operation. In addition, as Plaintiffs argue, "Defendant also testified that she had received a copy of the application that was recovered from the safe after the fire" and that Defendant never proffered a different version of the application. (Pls.' Reply, 2; Ex. 9, Tr. 79:1-22). Therefore, the Court finds that this dispute does not present a genuine issue for trial and grants summary judgment in favor of Plaintiffs. Accordingly, the Court need not address whether the seamstress/designer activity was a material omission sufficient to render the Policy void nor whether Defendant violated her post-loss duty to cooperate.

## C. Reformation

As noted above, Count I of the Third Party Complaint seeks reformation of the Policy. Agents owe a fiduciary duty to the insurance company and act as employees, whereas a broker represents only the insured. Weinisch v. Sawyer, 123 N.J. 333, 340 (1991). "When a broker's negligence leads to inadequate coverage, he or she is liable to pay money damages to the insured for the resulting loss. Because a broker, unlike an agent, is not employed by the insurer, the broker's breach will not support an action for reformation." Id. at 341 (citations omitted). Nor can a broker obtain indemnification from the insurer. Id. In her Opposition, Defendant does not

dispute that summary judgment is appropriate. Accordingly, the Court grants summary judgment in favor of Third Party Defendant as to Count I of Defendant's Third Party Complaint.

### D. New Jersey Consumer Fraud Act

In Plemmons v. Blue Chip Ins. Services, Inc., the Superior Court of New Jersey, Appellate Division, interpreted New Jersey statutory law governing insurance producers and wrote as follows: "we are satisfied that insurance brokers are 'semi-professionals' who are excluded from liability under the CFA for the services they render within the scope of their professional licenses." Plemmons v. Blue Chip Ins. Services, Inc., 387 N.J. Super. 551, 564, 904 A.2d 825 (A.D. 2006). The Appellate Division reasoned that "insurance brokers are subject to testing, licensing and regulation comparable to real estate brokers, and thus are exempt from liability under the CFA." Id. at 565. Therefore, insofar as Third Party Defendants are licensed insurance brokers, the CFA does not apply to them. See Call v. Czaplicki, Civ. No. 09-6561, 2010 WL 3724275 (D.N.J. Sept. 16, 2010). Defendant does not argue that summary judgment regarding this claim is unwarranted. Thus, the Court grants summary judgment in favor of Third Part Defendants as to Count V of Defendant's Third Party Complaint.

### IV. CONCLUSION

Therefore, the Court grants summary judgment in favor of Plaintiffs and rescinds the Policy. The Court should additionally grants summary judgment in favor of Third Party

Defendants on Defendant's reformation (Count I) and Consumer Fraud Act (Count V) claims only.

An appropriate Order accompanies this Opinion.

Dated: May 31, 2012

Jose L. Linares
United States District Judge